FIRST FEDERAL SAVINGS & LOAN ASSOCIATION OF AKRON, APPELLEE, *v.* CHETON & RABE, A PARTNERSHIP, APPELLANT.

(No. 13703—Decided January 25, 1989.)

*James A. Hall,* for appellee.
*Harry A. Tipping,* for appellant.

CACIOPPO, J. The partnership of Cheton & Rabe ("C & R"), appellant, appeals the judgment of the trial court denying relief on claims of breach of contract and breach of the duty of good faith brought against Great Northern Savings Company. The relevant facts are as follows.

In April 1978, C & R borrowed from Great Northern the approximate sum of $606,850. C & R also borrowed the same amount from First Federal Savings & Loan Association of Akron, appellee. In turn, C & R executed with each lender a note secured by a mortgage and security agreement on the premises located at 2262 South Arlington Street, Akron, Ohio. The lenders were co-first mortgagees on this property which housed a furniture store operated by C & R.

The note given to Great Northern provided for a fixed interest rate of 9.25 percent until April 1, 1983, at which time the interest rate changed to a variable rate. The relevant portions of this note provided as follows:

"PROVIDED, HOWEVER, in the event that GREAT NORTHERN SAVINGS CO. 'cost of money' as of the close of business on the 15th Day of November, February, May, or August, in any year thereafter shall cumulatively decrease or increase by ¼ of 1% per annum or more from GREAT NORTHERN SAVINGS CO. 'cost of money' on February 15, 1983, then the INTEREST RATE hereon in each such instance thereafter shall be DECREASED or INCREASED as the case may be, by a similar DECREASE OR INCREASE. * * * The fact that

the holder may not have invoked an increase, in whole or in part, shall not be deemed a waiver of holder's right to invoke said increase at any time thereafter as herein provided. GREAT NORTHERN SAVINGS CO. 'cost of money' shall mean the weighted average of interest paid by GREAT NORTHERN SAVINGS CO. from time to time upon its savings accounts, Certificates of Deposit, Christmas Club accounts and borrowed money.

"It is expressly understood and agreed that GREAT NORTHERN SAVINGS CO. shall determine such 'cost of money' on the 15th day of November, February, May and August of each year until the indebtedness evidenced hereby shall have been paid in full, and notice of any such decrease or increase in interest as aforesaid shall be given to all persons obligated hereon, by depositing such notice in the United States mail, addressed to the last known post office address of each person affected not later than fifteen (15) days thereafter.

"* * *

"If default be made in the payment of the whole or any part of any of the several installments of this Note when due, or in the performance of any of the terms, agreements, covenants or conditions contained in said Mortgage and Security Agreement, any loan application or other agreement pertaining to this Note, and if such default continues for a period of ten (10) days, then, or any time thereafter during the continuance of any such default, the entire unpaid principal balance of this Note along with any sums due the holder hereof for advances made by it as hereinbefore provided, together with the interest accrued thereon, shall, at the election of the holder, and without notice of such election and without demand or presentment, become immediately due and payable at the place of payment aforesaid, any-

thing contained herein or in said Mortgage and Security Agreement to the contrary notwithstanding, and the principal balance along with any sums due the holder hereof for advances made by it as hereinbefore provided, together with the interest accrued thereon, so accelerated and declared due as aforesaid, shall thereafter bear interest at the rate of two percent (2%) per annum above the rate of interest stated herein in effect at the time of such default until said principal balance is paid in full.

"* * *

"* * * Provided, however, that there shall be an adjustment in the interest rate chargeable hereunder as follows: to the extent that the Cost of Money of GREAT NORTHERN SAVINGS CO. as of April 15, 1983 and annually on each April 15 thereafter, exceeds of [sic] is less than its Cost of Money as of the close of business on the date hereof, which cost of money is 6.414% then the nominal rate hereunder shall be decreased or increased by the same nominal percentum, provided, however, that the maximum interest rate shall not exceed Eleven and one-quarter percentum, (11.25%), nor be less than Seven and one-quarter percentum, (7.25%). The fact that the holder may not have invoked an increase, in whole or in part, shall not be deemed a waiver of holder's right to invoke said increase at any time thereafter as herein provided."

In April 1983, Great Northern notified C & R that its new interest rate was 10.25 percent, and C & R made payments accordingly. In January 1984, Great Northern notified C & R that the interest rate was being increased to 11.25 percent, and again, C & R's payments were made according to the new rate.

On September 27, 1985, fifty-two percent of the business premises of C

& R was destroyed by fire. Shortly thereafter, Charles Cheton, one of the two C & R partners, approached both Great Northern and First Federal seeking a moratorium on the mortgage payments until he could get the business stable again. The property was insured under a policy with the United States Fidelity & Guaranty Company ("USF&G"), and both lenders were named as insureds. Neither lender would agree to such a moratorium. C & R failed to make any further payments to either lender. After C & R's account with Great Northern was ninety days delinquent, Great Northern declared C & R to be in default and invoked the two-percent penalty interest rate provided for in the note, resulting in an interest rate of 13.25 percent. In the interim, Charles Cheton proceeded to re-open the business at a temporary location with approximately $140,000 that he had borrowed on his personal assets.

On March 14, 1986, First Federal filed a complaint for foreclosure, on account, money due on note, and declaratory judgment, which eventually gave rise to the claims at issue in this appeal. First Federal named as defendants, *inter alia,* C & R and Great Northern.[1] Great Northern answered the complaint and included a cross-claim for foreclosure against C & R. On August 26, 1986, USF&G paid the balance on the note to Great Northern; the remainder of the insurance proceeds went to First Federal and C & R. The property was eventually restored by C & R. On August 29, 1986, C & R filed a four count cross-claim against Great Northern.[2]

Of these four counts, two were dismissed prior to trial. The remaining counts consisted of a claim for breach of contract alleging that Great Northern did not comply with the terms of the note by failing to properly adjust and compute the interest due, including the default penalty. C & R further asserted that by failing to provide C & R with data as to how the cost of money was calculated, Great Northern overcharged and levied unjust penalties. C & R also stated a claim for breach of the duty of good faith based on the manner and fashion in which the foreclosure was conducted; the fact that Great Northern filed for foreclosure when the property was insured; and by suggesting to Charles Cheton that he consider using his personal assets to satisfy the debt. C & R sought compensatory damages for breach of contract, and compensatory as well as punitive damages for breach of the duty of good faith.

The case was tried before a referee who subsequently filed a report and recommendation containing findings of fact and conclusions of law. The referee recommended that judgment be entered in favor of Great Northern.

C & R filed objections to the report which the trial court considered. Thereafter, the trial court adopted, in its entirety, the referee's report and recommendation, and dismissed the claims of C & R. C & R now appeals.

---

[1] First Federal named eight additional defendants, including USF&G. Numerous cross-claims and counterclaims were filed among the parties; however, all were eventually settled and/or dismissed, with the exception of C & R's cross-claim against Great Northern.

[2] We note that C & R's cross-claim is missing from the transcript of docket and journal entries filed with this court. Therefore, we have relied on the remainder of the record to glean, as best we can, the extent of C & R's claims and the damages which were sought. C & R has also failed to transmit the exhibits admitted at trial, and therefore our decision in that respect is also based on the remainder of the record.

The appellee argues that the first three assignments actually concern the weight of the evidence. In its reply brief, the appellant argues that the interpretation of contracts presents questions of law, and therefore this court is not constrained by any standard requiring deference to the findings of the lower court. We agree with both arguments, but some clarification is necessary. The Ohio Supreme Court has stated that "[i]f a contract is clear and *unambiguous,* then its interpretation is a matter of law and there is no issue of fact to be determined." (Citation omitted.) (Emphasis added.) *Inland Refuse Transfer Co.* v. *Browning-Ferris Industries of Ohio, Inc.* (1984), 15 Ohio St. 3d 321, 322, 15 OBR 448, 449, 474 N.E. 2d 271, 272.

However, whether a party complied with an unambiguous contract term is a question of fact. With that background, we proceed to the first assignment of error:

### Assignment of Error I

"The court erred in ruling that Great Northern Savings Co. did not breach their [*sic*] contractual obligations under the note when it assessed interest in an amount greater then [*sic*] that allowable under the maximum interest rate cap contained in the note."

It is C & R's position that the term in the note stating that the maximum interest could not exceed 11.25 percent included the penalty interest upon default, so that if the effective interest rate at the time of default was 11.25 percent, an additional two-percent penalty could not be assessed because it would be over the maximum rate allowed. C & R further claims that the referee failed to make findings of fact and conclusions of law on this issue. We find no merit in appellant's contentions. The referee did refer to the default penalty interest in his findings of fact and conclusions of law, and the manner in which he did so indicates that he found the relevant provisions unambiguous. In his third finding of fact, the referee states:

"* * * [Great Northern] also increased the interest to the penalty interest rate because of Cheton and Rabe's default, which it was fully authorized to do."

Further, in his third conclusion of law, the referee stated:

"As a lender, * * * [Great Northern's] conduct to apply penalty interest after the fire and subsequent to the default were [*sic*] permissible and legal."

The provision setting the maximum rate of interest at 11.25 percent is tied directly to the cost of money, and has nothing to do with default. C & R is taking the term "maximum" out of the context in which it is used. Appellant's first assignment of error is overruled.

### Assignment of Error II

"The court erred in finding that Great Northern Savings Co. did not breach its contractual obligations under the note when it failed to provide the plaintiff with the underlying information that formed the basis for Great Northern's computation of the appropriate variable interest rate applicable under the terms of the note."

C & R maintains that Great Northern breached the contract by failing to provide it with notice of increases or decreases in the cost of money prior to the 1983 and 1984 increases in the interest rate. The relevant portion of the note provides:

"It is expressly understood and agreed that GREAT NORTHERN SAVINGS CO. shall determine such 'cost of money' on the 15th day of November, February, May and August of each year until the indebtedness evidenced hereby shall have been paid in full, and *notice of any such decrease or increase in interest* as aforesaid

shall be given to all persons obligated hereon * * *." (Emphasis added.)

C & R claims that the term "notice" is ambiguous because it is not stated of what the notice shall consist. C & R further argues that because the term is ambiguous, parol evidence should have been considered to explain the term. C & R offered the testimony of Charles Cheton who stated that during the negotiation of the terms of the note, it was his understanding that C & R would be provided with information as to the calculation of Great Northern's cost of money. Cheton also claimed that after the interest rate increased, he requested this type of information from Great Northern on several occasions and was told that it would be provided, but it never was.

In his second conclusion of law, the referee stated that Great Northern was not obligated under the contract to supply this material. We agree. C & R's contention that there is ambiguity in the term "notice" ignores the plain language used in the contract. It is clear that what C & R is entitled to is notice of increases or decreases in interest. As the appellee states in his brief, the terms "interest" and "cost of money" are mutually exclusive. The amount of interest is dependent upon the cost of money, but the language used clearly and plainly states that all C & R is entitled to is notice of increases or decreases in interest. Because there is no ambiguity, it is neither necessary nor permissible to go beyond the four corners of the agreement; the parol evidence rule excludes from consideration evidence as to other oral promises resulting from negotiations. *Charles A. Burton, Inc.* v. *Durkee* (1952), 158 Ohio St. 313, 49 O.O. 174, 109 N.E. 2d 265, paragraph two of the syllabus.

As to Cheton's claim that the bank never complied with his requests for the information, the referee found from the evidence "that at no time did Cheton & Rabe ever receive from Great Northern a promise to provide the materials concerning the cost of money such that these could be considered a part of the contract on the note."

We agree that the issue of Cheton's requests for this information is unrelated to the contract since he was not entitled to the information under the agreement. C & R's second assignment of error is overruled.

### Assignment of Error III

"The court erred in finding that Great Northern Savings Co. did not breach its contractual obligations under the note when it computed the variable interest rate applicable under the note."

In essence, C & R argues that the increase of the interest rate in January of 1984, from 10.25 percent to 11.25 percent, violated the terms of the note. C & R claims that the note provides three separate methods for calculation of the interest rate and that these methods conflict, creating an ambiguity in the contract. The referee found no such conflict, and also found and concluded that C & R failed to prove that the interest was incorrectly calculated. The record supports this finding and conclusion.

C & R presented no evidence to support its interpretation of how the interest should have been calculated, and failed in its attempts to prove its point upon cross-examination of Great Northern's witnesses.

There being some competent, credible evidence presented by Great Northern to support the trial court's judgment that the interest was correctly calculated, the appellant's third assignment of error is not well-taken.

### Assignment of Error IV

"The court erred in refusing to allow the plaintiff-appellant's eco-

nomic expert to testify on the issue of damages and on the issue of the proper computation of the variable interest rate applicable under the note.''

During the trial, C & R attempted to introduce the testimony of Dr. John Burke as an expert witness on the issue of damages, *i.e.*, the difference between what C & R was charged on the note and what it should have been charged. The referee excluded the testimony because Burke's testimony was to consist of a comparison between the fair market value of the note and the rate charged by Great Northern; the issue in the case was whether, under the terms of the note itself, Great Northern's calculations were correct. The amount of damages, therefore, would have been what C & R was charged and what it should have been charged according to the note.

C & R proffered Dr. Burke's testimony into the record. While he may have been considered an expert in the field of economics, Evid. R. 702 provides:

''If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence *or to determine a fact in issue,* a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.'' (Emphasis added.)

Because Burke's testimony was not related to facts at issue in the case, the referee did not abuse his discretion in excluding it.

Assignment of Error IV is not well-taken.

## Assignment of Error V

''The court erred in finding that the conduct of Great Northern Savings Company in accelerating the loan despite the existence of adequate insurance proceeds to protect Great Northern, in advising the partners of Cheton & Rabe to use personal funds to satisfy the loan, and in opposing the application of Cheton & Rabe for an advance in insurance proceeds to put the business back on its feet did not constitute a breach of the duty of good faith and fair dealing implied in the note and under the Uniform Commercial Code.''

C & R argues that the referee erred in failing to find that Great Northern breached the duty of good faith implied in all contracts and required under the Uniform Commercial Code. C & R claims that Great Northern acted in bad faith by (1) refusing C & R's request to place a moratorium on payments; (2) placing C & R in default when Great Northern knew that the collateral was insured; (3) suggesting to Charles Cheton that he use his personal assets to cure the default; and (4) objecting to C & R's attempts to obtain an advance on insurance proceeds. C & R argues that these actions on the part of Great Northern were callous in light of the fact that it had sustained such a devasting loss as a result of the fire.

In his findings, the referee stated that while the lenders were insured under the policy, no monies under the policy were ever paid to Great Northern until August 1986. The referee further found that Great Northern was fully authorized to reject Cheton's request for a moratorium on payments, and was also fully authorized to impose the penalty interest upon C & R's default. The referee then found that, as a co-defendant in the suit filed by First Federal, Great Northern was required and had an absolute right to answer or otherwise plead, to protect its interests, and at that time it was clear that no stake holders could be assured of any or all of the insurance proceeds to protect their security interests.

Based upon these findings, the referee stated in his conclusions of law that C & R failed to show that Great Northern violated any state or federal

laws by its conduct, and that C & R failed to show any actual or implied malice, recklessness, or ill will on the part of Great Northern. The referee also concluded that C & R failed to demonstrate or prove which of the subsections of R.C. 1301.09 it believed was concerned in the dispute, and even assuming that it had, C & R failed to prove that Great Northern's conduct was not within the general definition of "good faith" as honesty in fact in the conduct of the transaction. R.C. 1301.01(S). Finally, the referee concluded that Great Northern's actions in foreclosing and suing upon the note were not illegal, improper, or in violation of the agreement, but were proper remedies in the event of default.

Upon our review of the record, we find the referee's findings to be supported by the evidence. As to Great Northern's refusal of a moratorium on payments, C & R's claim of bad faith is without merit. The fact that C & R views the bank's refusal of its request as "callous" has no bearing on an arm's-length commercial transaction such as this. C & R ageed to make the monthly payments; the contract contains no indication that this obligation was contingent upon the fact that the business was fully operative. Great Northern's insistence on regular payments according to the terms of the contract cannot be considered as an act of bad faith.

As to the contention that Great Northern "placed" C & R into default, it is clear that the default occurred automatically as a result of C & R's failure to make the payments.[3] It seems to be the acceleration of the debt about which C & R is actually complaining. As cited above, the referee specifically found that no conclusions as to payment had been made at the time Great Northern accelerated the note. A vice president of Great Northern testified that at the time of acceleration, adjustment of the insurance loss was not imminent. This witness further testified that acceleration was required by the Federal Home Loan Bank, Great Northern's regulator, once an account was delinquent ninety days. Thus, the record contains substantial, competent evidence that Great Northern was within its rights in accelerating the debt.

C & R's argument that it was bad faith for Great Northern to suggest that Charles Cheton use his personal assets to make the payments ignores that fact that each partner is jointly liable for the contractual obligations of the partnership. R.C. 1775.14. See, also, 13 Ohio Jurisprudence 3d (1979), Business Relationships, Section 971. The first sentence of the agreement contains a joint and several promise to pay. Moreover, the fact that Charles Cheton actually did use his personal assets as collateral to re-open the business at a temporary location instead of to pay the debt to Great Northern leads to a conclusion that such a suggestion on the part of Great Northern was more practical than it was "callous."

Finally, the argument as to Great Northern's objection to C & R's receiving advances in insurance proceeds is without merit, as C & R was given the advance.

Appellant's fifth assignment of error is not well-taken.

Assignment of Error VI

"The court erred in refusing to

---

[3] There was also evidence that C & R failed to pay the property taxes after the fire, as well as evidence that USF&G cancelled the insurance on the property. Although C & R claimed that it obtained additional insurance, the testimony showed that Great Northern was never notified. There was testimony that each of these instances was additional grounds for default.

allow testimony on the differences between the manner in which First Federal Savings and Loan Association of Akron handled its note with Cheton & Rabe and how Great Northern Savings Co. handled its note with Cheton & Rabe.''

C & R argues that the referee erred in excluding the testimony of David Enlow, a vice-president of First Federal Savings & Loan, on the grounds of relevancy. C & R claims that this testimony was relevant to the issue of whether Great Northern acted in good faith, as the manner in which First Federal handled its note could be compared to the actions taken by Great Northern.

The record shows, however, that in its objections to the referee's report and recommendation, C & R failed to raise the issue of exclusion of this testimony. As such, C & R denied the trial court the opportunity to correct the alleged error. An appellate court will not consider any error which counsel for the party complaining of the trial court's judgment could have called, but did not call, to the trial court's attention at a time when the error could have been avoided or corrected by the trial court. *State* v. *Williams* (1977), 51 Ohio St. 2d 112, 5 O.O. 3d 98, 364 N.E. 2d 1364, paragraph one of the syllabus.

Appellant's sixth assignment of error is overruled.

### Assignments of Error

"VIII. The court erred in finding that the doctrine of laches applies to bar the plaintiff's claims.

"VIII. The court erred in finding that the doctrine of waiver applies to bar the plaintiff's claims.

"IX. The court erred in finding that the doctrine of estoppel applies to bar the plaintiff's claims."

In its answer to C & R's cross-claim, Great Northern asserted the af-firmative defenses of laches, waiver, ratification, and estoppel to C & R's allegations of error in the calculation of the variable interest rate. Great Northern asserted that C & R had failed to timely raise objections to the interest rate which the partnership suspected at an early point in time to be incorrectly calculated.

In his conclusions of law, the referee first stated that the variable interest rate was fairly and correctly calculated within the terms of the contract. He then went on to conclude that assuming *arguendo* that there had been calculation errors, the doctrines of laches, waiver, ratification and estoppel would apply against C & R.

Because we have upheld the referee's findings and conclusions as to the correctness of the calculations, these assignments of error are moot.

The judgment of the trial court is affirmed.

*Judgment affirmed.*

GEORGE, P.J., and CHRISTLEY, J., concur.

JUDITH A. CHRISTLEY, J., of the Eleventh Appellate District, sitting by assignment.